IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TENESHIA PEOPLES, | ) | CASE NO. 1:16 CV 1081 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## Introduction

Before me[1] is an action by Teneshia E. Peoples under 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security denying her application

for supplemental security income.[2] The Commissioner has answered[3] and filed the transcript

of the administrative record.[4] Under my initial[5] and procedural[6] orders, the parties have

---

[1] ECF # 11. The parties have consented to my exercise of jurisdiction.

[2] ECF # 1.

[3] ECF # 8.

[4] ECF # 9.

[5] ECF # 5.

[6] ECF # 10.

briefed their positions[7] and filed supplemental charts[8] and the fact sheet.[9] They have participated in a telephonic oral argument.[10]

## Facts

### A.    Background facts and decision of the Administrative Law Judge ("ALJ")

Peoples who was forty-four years old at the time of the administrative hearing,[11] has a general equivalency diploma (GED) and a vocational certificate in data entry.[12] She is not married and has children, but they do not live with her.[13] Her past relevant employment history includes work as a fast food worker, machine feeder, and hand packager.[14]

The ALJ, whose decision became the final decision of the Commissioner, found that Peoples had the following severe impairments: affective disorder, osteoarthritis of the hips and left knee, and degenerative disc disease of the lumbar spine (20 CFR 416.920(c)).[15]

---

[7] ECF # 20 (Commissioner's brief); ECF # 15 (Peoples's brief).

[8] ECF # 20-1 (Commissioner's charts); ECF # 15-1 (Peoples's charts).

[9] ECF # 14 (Peoples's fact sheet).

[10] ECF # 23.

[11] ECF # 9, Transcript ("Tr.") at 38.

[12] *Id*. at 39.

[13] *Id*. at 38.

[14] *Id*. at 22.

[15] *Id*. at 12.

After concluding that the relevant impairments did not meet or equal a listing, the ALJ made the following finding regarding Peoples's residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant should have the ability to change positions from standing or walking to sitting at least at 30 minute[s] intervals; can occasionally lift and carry up to 10 pounds, frequently lift and carry less than 10 pounds, and can push and pull as much as she can lift and carry; can never climb ramps, stairs, ladders, or scaffolds; and can occasionally balance, stoop, kneel, crouch, and crawl; should never work at unprotected heights; and never work around moving mechanical parts. The claimant is limited to simple, routine, and repetitive tasks but not at a production rate pace and is limited to making simple work related decisions.[16]

Given that residual functional capacity, the ALJ found Peoples incapable of performing her past relevant work as a fast food worker, machine feeder, and hand packager.[17]

Based on an answer to a hypothetical question posed to the vocational expert at the hearing setting forth the residual functional capacity finding quoted above, the ALJ determined that a significant number of jobs existed locally and nationally that Peoples could perform. The ALJ, therefore, found Peoples not under a disability.[18]

**B.     Issues on judicial review**

Peoples asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record. Specifically, Peoples presents the following issues for judicial review:

---

[16] *Id.* at 15.

[17] *Id.* at 22.

[18] *Id.* at 24.

- Whether the ALJ failed to correctly evaluate Ms. Peoples' orthopedic conditions under Listings 1.02.

- Whether the ALJ erred in her evaluation of the treating physicians' opinions and the functional capacity assessment.

- Whether the material new evidence warrants remand.[19]

For the reasons that follow, I will conclude that the ALJ's finding of no disability is supported by substantial evidence and, therefore, must be affirmed.

## Analysis

**A.    Legal standards**

*1.    Substantial evidence*

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "

> The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different

---

[19] ECF # 15 at 1.

conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[20]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner survives "a directed verdict" and wins.[21] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[22]

I will review the findings of the ALJ at issue here consistent with that deferential standard.

**2.     *Treating physician rule and good reasons requirement***

The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[23]

---

[20] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

[21] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06CV403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[22] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

[23] 20 C.F.R. § 416.927(d)(2). The companion regulation for disability insurance benefits applications is § 404.1527(d)(2). [Plaintiff's last name only] filed only an application

If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight.[24]

The ALJ has the ultimate responsibility for determining whether a claimant is disabled.[25] Conclusory statements by the treating source that the claimant is disabled are not entitled to deference under the regulation.[26]

The regulation does cover treating source opinions as to a claimant's exertional limitations and work-related capacity in light of those limitations.[27] Although the treating source's report need not contain all the supporting evidence to warrant the assignment of controlling weight to it,[28] nevertheless, it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" to receive such weight.[29] In deciding if such supporting evidence exists, the Court will review the administrative record as a whole and may rely on evidence not cited by the ALJ.[30]

---

for supplemental security income benefits.

[24] *Id.*

[25] *Schuler v. Comm'r of Soc. Sec.*, 109 F. App'x 97, 101 (6th Cir. 2004).

[26] *Id.*

[27] *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 991 (N.D. Ohio 2003), citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2nd Cir. 2003).

[28] *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).

[29] *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001).

[30] *Id.* at 535.

In *Wilson v. Commissioner of Social Security*,[31] the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination.[32] The court noted that the regulation expressly contains a "good reasons" requirement.[33] The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.

- Identify evidence supporting such finding.

- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.[34]

The court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error.[35] It drew a distinction between a regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business.[36] The former confers a substantial, procedural right on

---

[31] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

[32] *Id.* at 544.

[33] *Id.*, citing and quoting 20 C.F.R. § 404.1527(d)(2).

[34] *Id.* at 546.

[35] *Id.*

[36] *Id.*

the party invoking it that cannot be set aside for harmless error.[37] It concluded that the requirement in § 1527(d)(2) for articulation of good reasons for not giving controlling weight to a treating physician's opinion created a substantial right exempt from the harmless error rule.[38]

The Sixth Circuit in *Gayheart v. Commissioner of Social Security*[39] recently emphasized that the regulations require two distinct analyses, applying two separate standards, in assessing the opinions of treating sources.[40] This does not represent a new interpretation of the treating physician rule. Rather it reinforces and underscores what that court had previously said in cases such as *Rogers v. Commissioner of Social Security*,[41] *Blakley v. Commissioner of Social Security*,[42] and *Hensley v. Astrue*.[43]

As explained in *Gayheart*, the ALJ must first consider if the treating source's opinion should receive controlling weight.[44] The opinion must receive controlling weight if (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent

---

[37] *Id.*

[38] *Id.*

[39] *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013).

[40] *Id.* at 375-76.

[41] *Rogers*, 486 F.3d at 242.

[42] *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009).

[43] *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009).

[44] *Gayheart*, 710 F.3d at 376.

with other substantial evidence in the administrative record.[45] These factors are expressly set out in 20 C.F.R. § 416.927(d)(2). Only if the ALJ decides not to give the treating source's opinion controlling weight will the analysis proceed to what weight the opinion should receive based on the factors set forth in 20 C.F.R. §§ 416.927(d)(2)(i)-(ii), (3)-(6).[46] The treating source's non-controlling status notwithstanding, "there remains a presumption, albeit a rebuttable one, that the treating physician is entitled to great deference."[47]

The court in *Gayheart* cautioned against collapsing these two distinct analyses into one.[48] The ALJ in *Gayheart* made no finding as to controlling weight and did not apply the standards for controlling weight set out in the regulation.[49] Rather, the ALJ merely assigned the opinion of the treating physician little weight and explained that finding by the secondary criteria set out in §§ 1527(d)(i)-(ii), (3)-(6) of the regulations,[50] specifically the frequency of the psychiatrist's treatment of the claimant and internal inconsistencies between the opinions

---

[45] *Id.*

[46] *Id.*

[47] *Rogers*, 486 F.3d at 242.

[48] *Gayheart*, 710 F.3d at 376.

[49] *Id.*

[50] *Id.*

and the treatment reports.[51] The court concluded that the ALJ failed to provide "good reasons" for not giving the treating source's opinion controlling weight.[52]

> But the ALJ did not provide "good reasons" for why Dr. Onady's opinions fail to meet either prong of this test.

> To be sure, the ALJ discusses the frequency and nature of Dr. Onady's treatment relationship with Gayheart, as well as alleged internal inconsistencies between the doctor's opinions and portions of her reports. But these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight.[53]

In a nutshell, the *Wilson/Gayheart* line of cases interpreting the Commissioner's regulations recognizes a rebuttable presumption that a treating source's opinion should receive controlling weight.[54] The ALJ must assign specific weight to the opinion of each treating source and, if the weight assigned is not controlling, then give good reasons for not giving those opinions controlling weight.[55] In articulating good reasons for assigning weight other than controlling, the ALJ must do more than state that the opinion of the treating physician disagrees with the opinion of a non-treating physician[56] or that objective medical evidence does not support that opinion.[57]

---

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Rogers*, 486 F.3d 234 at 242.

[55] *Blakley*, 581 F.3d at 406-07.

[56] *Hensley*, 573 F.3d at 266-67.

[57] *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-52 (6th Cir. 2010).

The failure of an ALJ to follow the procedural rules for assigning weight to the opinions of treating sources and the giving of good reason for the weight assigned denotes a lack of substantial evidence even if the decision of the ALJ may be justified based on the record.[58] The Commissioner's *post hoc* arguments on judicial review are immaterial.[59]

Given the significant implications of a failure to properly articulate (*i.e.*, remand) mandated by the *Wilson* decision, an ALJ should structure the decision to remove any doubt as to the weight given the treating source's opinion and the reasons for assigning such weight. In a single paragraph the ALJ should state what weight he or she assigns to the treating source's opinion and then discuss the evidence of record supporting that assignment. Where the treating source's opinion does not receive controlling weight, the decision must justify the assignment given in light of the factors set out in §§ 1527(d)(1)-(6).

The Sixth Circuit has identified certain breaches of the *Wilson* rules as grounds for reversal and remand:

- the failure to mention and consider the opinion of a treating source,[60]

- the rejection or discounting of the weight of a treating source without assigning weight,[61]

---

[58] *Blakley*, 581 F.3d at 407.

[59] *Wooten v. Astrue*, No. 1:09-cv-981, 2010 WL 184147, at *8 (N.D. Ohio Jan. 14, 2010).

[60] *Blakley*, 581 F.3d at 407-08.

[61] *Id.* at 408.

- the failure to explain how the opinion of a source properly considered as a treating source is weighed (*i.e.*, treating v. examining),[62]

- the elevation of the opinion of a nonexamining source over that of a treating source if the nonexamining source has not reviewed the opinion of the treating source,[63]

- the rejection of the opinion of a treating source because it conflicts with the opinion of another medical source without an explanation of the reason therefore,[64] and

- the rejection of the opinion of a treating source for inconsistency with other evidence in the record without an explanation of why "the treating physician's conclusion gets the short end of the stick."[65]

The Sixth Circuit in *Blakley*[66] expressed skepticism as to the Commissioner's argument that the error should be viewed as harmless since substantial evidence exists to support the ultimate finding.[67] Specifically, *Blakley* concluded that "even if we were to agree that substantial evidence supports the ALJ's weighing of each of these doctors' opinions, substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(d)(2) as harmless error."[68]

---

[62] *Id.*

[63] *Id.* at 409.

[64] *Hensley*, 573 F.3d at 266-67.

[65] *Friend*, 375 F. App'x at 551-52.

[66] *Blakley*, 581 F.3d 399.

[67] *Id.* at 409-10.

[68] *Id.* at 410.

In *Cole v. Astrue*,[69] the Sixth Circuit reemphasized that harmless error sufficient to excuse the breach of the treating source rule only exists if the opinion it issues is so patently deficient as to make it incredible, if the Commissioner implicitly adopts the source's opinion or makes findings consistent with it, or if the goal of the treating source regulation is satisfied despite non-compliance.[70]

## B. Application of standards

This matter presents three issues that will be addressed individually.

### 1. *Listing 1.02*

Here, Peoples contends that the ALJ failed to properly evaluate her various orthopedic impairments under Listing 1.02.[71] She maintains that the ALJ misconstrued the requirements of the listing as mandating the use of a hand-held assistive device that limits the functioning of both upper extremities.[72] She argues that the use of an assistive device is not the sole definition in the listing of an inability to ambulate effectively,[73] and in that regard asserts that "evidence of her slow, antalgic waddling gait precludes walking a block at a reasonable pace

---

[69] *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011).

[70] *Id.* at 940.

[71] ECF # 15 at 11.

[72] *Id.*

[73] *Id.* at 12.

on rough or uneven surfaces and [so] results in the inability to carry out routine ambulatory tasks...."[74]

Magistrate Judge Limbert recently assessed a similar situation in *Brown v. Colvin*.[75] In his report and recommendation, which was subsequently adopted, he began by setting forth the elements for meeting Listing 1.02:

Listing 1.02A provides:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;[76]

As stated in Listing 1.02A, that listing requires that a claimant demonstrate an inability to ambulate effectively as that term is defined in Listing 1.00B:

B. Loss of function.

1. General. Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods

---

[74] *Id*. at 14.

[75] *Brown v. Colvin*, No. 1:14 CV 2410, 2016 WL 1068966, at * 10 (N.D. Ohio Feb. 5, 2016) report & recommendation adopted *Brown v. Colvin*, 2016 WL 1071103 (N.D. Ohio Mar. 17, 2016).

[76] *Brown*, 2016 WL 1068966, at *8.

of immobility or convalescence. The provisions of 1.02 and 1.03 notwithstanding, inflammatory arthritis is evaluated under 14.09 (see 14.00D6). Impairments with neurological causes are to be evaluated under 11.00ff.

2. How We Define Loss of Function in These Listings

a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone. When there is an inability to perform these activities due to a mental impairment, the criteria in 12.00ff are to be used. We will determine whether an individual can ambulate effectively or can perform fine and gross movements effectively based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) and 1.00B2c.

b. What We Mean by Inability To Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.[77]

The Commissioner here contends that Peoples failed to provide any medical evidence for the first four elements of Listing 1.02 - *i.e.*, gross anatomical deformity of a joint, chronic joint pain or stiffness, signs of limitation of motion or other abnormal motion of a joint, and images showing joint space narrowing - and instead focused on the factors set forth in Listing 1.00B, which only become relevant after a showing has been made of the four physical elements cited above.[78] As the Listing itself states, the claimant initially establishes the physical deformity or impairment of a joint, and then demonstrates that this physical condition results in inability to ambulate effectively.

Here, the ALJ did not analyze or articulate on this Listing under its separate component elements. The ALJ's opinion states, in conformity with the Listing as a whole, that Peoples "did not demonstrate gross anatomical deformity and chronic joint pain and

_____

[77] *Id*. at * 9.

[78] ECF # 20 at 18.

stiffness with signs of limitation of motion or other abnormal motion of the affected joints and findings on appropriate medically acceptable imaging of joint space narrowing, bony deconstruction, or ankylosis of the affected joint **with** the involvement of a major weight bearing joint **resulting** in the inability to ambulate effectively as defined in Listing 1.00B2b."

In other words, the ALJ stated that she was assessing Peoples under the entirety of the Listing, and did not, as the Commissioner asserts, make an independent finding that Peoples had not shown the medical evidence contemplated in the earlier passages of the Listing. Indeed, a review of other portions of the opinion discloses that the ALJ found multiple examples of where Peoples provided clinical findings that show impairments in her hips and knees.[79]

Accordingly, although the ALJ in this passage of the opinion made no separate findings about the medical or clinical evidence needed to show limitations of the joint, that evidence was cited elsewhere. The ALJ then focused exclusively on whether these limitations cause a failure to ambulate effectively, stating specifically that "the record, consistent with the findings below, failed [sic] to demonstrate an inability to ambulate

---

[79] In that regard, the ALJ makes reference in other portions of the opinion to: x-rays that show sclerosis of the hip joints; the fact that an examination of Peoples's left leg was impeded by her "guarding" of the leg; a notation of an antalgic gait; a CT scan which showed "bilateral hip osteoarthritis with hip joint arthropathy and left knee osteoarthritis due to moderate left and mild right knee degenerative arthropathy." Tr. at 16-17. Indeed, at Step Two "osteoarthritis of the hips and left knee" was acknowledged to be a severe impairment. Tr. at 12. To the extent that the Commissioner now argues that no showing by clinical evidence was made for meeting the physical limitations of Listing 1.02, I find that this argument is unpersuasive.

effectively, as defined in 1,00B2b, which occurred, or is expected to occur within 12 months of onset."[80]

In this regard, the ALJ characterized the inability to ambulate requirement of Listing 1.00B2b as "having insufficient lower extremity function to permit independent ambulation without the use of a hand-held assistive device that limits functioning of *both* upper extremities."[81] The ALJ then made three findings: (1) the "majority of the medical evidence does not document that [Peoples] was actually using a cane, and as such (2) the medical documentation does not support the use of an assistive device that, the use of which, would limit the functioning of both upper extremities and (3) does not establish an inability to ambulate effectively, as defined in 1.00B2b as required for either listing."[82]

Peoples now contends that the error in this analysis by the ALJ consists in the ALJ improperly confining her consideration of ineffective ambulation to the single question of whether Peoples needed a hand-held assistive device that limited the functioning of her upper extremities.[83] Viewed correctly, she maintains that the evidence of her pain, decreased leg strength, limited range of motion  and gait, which was described on several occasions as

---

[80] Tr. at 13.

[81] *Id*. (emphasis original).

[82] *Id*. The reference to "either listing" concerns Listing 1.03 addressing reconstructive surgery where ambulation is also ineffective under the same standard.

[83] ECF # 15 at 11-13.

"antalgic" or "waddling,"[84] shows that she satisfies the ineffective ambulation requirement of the listing without reference to use of a cane.

Initially, the Commissioner claims too much by asserting courts *per se* construe ineffective ambulation under Listing 1.00B2b only by reference to hand-held assistive devices.[85] It is true that many, if not most, of cases dealing with Listing 1.00B2b do involve the presence of such devices in the record.[86] But, as detailed above, the Listing itself focuses on "insufficient lower extremity functioning" which is "generally" shown by reference to hand-held assistive devices.

To that point, in *O'Neill v. Colvin*,[87] Judge Polster adopted a report and recommendation from Magistrate Judge Limbert where a claimant with morbid obesity who did not use any hand-held assistive device to assist with mobility, alleged that he met Listing 1.02 because he could not effectively ambulate.[88] The claimant in *O'Neill* maintained, without reference to any hand-held mobility devices,[89] that the proof of his difficulty with ambulation was that "he cannot go shopping without difficulty, he can only walk short

---

[84] *Id.* at 13 - 14 (citing record).

[85] ECF # 20 at 19.

[86] *See, Brown*, 2016 WL 1068966, at * 10 (collecting cases).

[87] *O'Neil v. Colvin*, No. 1:13 CV 867, 2014 WL 3510982 (N.D. Ohio July 9, 2014).

[88] *Id.* at *15.

[89] Indeed, the ALJ here noted that the claimant required no assistive devices too aid him in ambulating. *Id.* at * 16.

distances, his hip flexion was limited due to his obesity, and his lower extremity mobility is limited by the girth surrounding his abdominal area, leading to hip limitations."[90]

Magistrate Judge Limbert, in recommending that the Commissioner's decision be affirmed, found that the occupational therapist who evaluated the claimant found that he could work at a "light" level and noted that he "ambulated normally."[91] He also noted that "none of the doctors who evaluated Plaintiff provided any limitations on his activities,"and further noted that a consulting examiner had found the claimant's gait to be "normal" and that he had "good lumbar mobility without evidence of instability."[92] Thus, both the ALJ's analysis and Magistrate Judge Limbert's review of ineffective ambulation were conducted without reference to hand-held assistive devices, but by concentrating on evidence in the record going to the claimant's ability to ambulate effectively under various circumstances and using various metrics, such as gait and stability.

Here, the ALJ does note that the medical evidence does not establish the need for a cane, but does not, in this portion of the opinion discuss all the other evidence related to Peoples's gait, range of motion, strength and ability to perform activities of daily living.[93] But, as noted, that discussion of the other evidence occurs later in the opinion, and includes findings that:

---

[90] *Id*. at *15.

[91] *Id*. at * 16.

[92] *Id.*

[93] These factors are discussed at some length elsewhere in the opinion. Tr. at 17.

- A 2013 physical examination found Peoples's "gait was independent without an assistive, although antalgic;"[94]

- despite "ongoing limited range of motion," Peoples was "independent, although labored," in the functional areas assessed;"[95]

- a therapist in 2013 reported that Peoples "was independent with activities of daily living, including stairs, lumbar range of motion had improved, and the strength in the bilateral lower extremities had increased;"[96]

- a follow-up visit with Dr. Harris found that Peoples's hip pain following a pain injection was "a lot better" and that "her walking had improved, and her knee pain improved after completing therapy."[97]

Moreover, in the specific discussion of Listing 1.00B2b the ALJ does cite to the fact that Peoples could "walk 50 feet without difficulty" and the fact that she chose to attend a 2014 functional evaluation without her prescribed cane.[98]

Taken together, and viewed in light of the fact that, as noted, the ALJ considered the requirements of Listings 1.02 and 1.00B2b in their entirety without separately analyzing each component part, I find no error in the standard of law employed by the ALJ. Substantial

---

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.* In a later section of the opinion the ALJ found that "[e]ven taking into account the objective evidence including the imagining studies and the recent surgery, longitudinal treatment history suggests that the claimant retained a measure of functional capacity as demonstrated by the claimant's demonstrated ability to ambulate and that claimant's allegations of pain were out of proportion to her reported daily activities such as general cleaning, laundry, shopping, taking public transportation, and even looking for work." *Id.* at 20.

[98] *Id.* at 13.

evidence supports the conclusion that Peoples does not meet Listing 1.02, even when that is understood as not being limited to addressing only situations with hand-held assistive devices. In that regard, as shown above, and in accordance with Magistrate Judge Limbert's analysis in *O'Neill*, the ALJ made multiple findings without reference to hand-held assistive devices that provide substantial evidence for the conclusion that Peoples does not meet Listing 1.02.

## 2. *Treating physician opinions*

### a. *Dr. Harris and Dr. Jahan Hashem*

In assigning little weight to the opinion of Dr. Michael Harris, M.D., who treated Peoples several times in 2013,[99] the ALJ concluded a lengthy summary of treatment notes from Dr. Harris[100] by finding that Dr. Harris's opinion as to the ultimate issue of disability involved an issue reserved to the Commissioner, and that the opinion is "vague" in its supporting reasons and inconsistent with the actual results of Dr. Harris's examinations.[101]

The ALJ gave Dr. Hashem's opinion only "partial" weight, observing also that the restrictions outlined by Dr. Hashem are "adequately considered" in the RFC, noting especially that the standing, walking, lifting and carrying restrictions opined by Dr. Hashem

---

[99] Tr. at 609-10, 614-15, 740.

[100] *Id.* at 17-18.

[101] *Id.* at 18.

"are consistent with the residual functional capacity assessment limiting the claimant to sedentary work."[102]

Peoples contends that the ALJ erred as concerns these physicians by not recognizing that because she saw multiple doctors at the same institution, such as these physicians, the ALJ should have considered the department records as a whole.[103] In fact, and as noted by the Commissioner, the ALJ expressly noted that Dr. Hashem agreed with the exam findings of Dr. Harris[104] and Dr. Harris's note after the visit of July 22, 2013 specifically states that he reviewed the file and discussed Peoples's case with Dr. Hashem.[105] I find no error in the ALJ not going into greater detail on this matter.

Further, in a December 16, 2013 treatment note these doctors stated in a single sentence that "[Peoples] is not capable of sustained employment."[106] Peoples accepts that this was the extent of this opinion, and appears to accept that insofar as it expresses an opinion as to ultimate disability that decision is reserved for the Commissioner.[107] But she

---

[102] *Id*. Peoples disagrees with the conclusion that the functional limitations in Dr. Hasheem's opinion are consistent with sedentary work. ECF # 15 at 18-19. It is not necessary to here resolve that question.

[103] ECF # 15 at 18.

[104] Tr. at 18.

[105] *Id*. at 615.

[106] *Id*. at 740.

[107] ECF # 15 at 17.

then asserts that the ALJ's analysis as to weight was "insufficiently specific" and did not consider the underlying record as a whole or any regulatory factors.[108]

In that regard, the ALJ did offer the explanation, cited above, that this opinion was vague because, among other things, it was inconsistent with the medical record of the physicians's examinations.[109] Those examination findings, which, as noted above in some detail, describe improvement as concerns relief from pain, better function, greater strength and independent mobility. Accordingly, the ALJ amply provided reasons for concluding that the functional opinions at question were given lesser weight, and such reasons were clearly given in a way that made them subject to meaningful judicial review.

b.     *Dr. Vij*

Dr. Vij's opinion was discussed at length by the ALJ:

> Dr. Vij completed a medical source statement, which indicated impairments such as limiting sitting, standing or walking for a total of 20 minutes in an 8-hour day which appear to be based upon the physical evaluation at Exhibit 20F, which as discussed above appeared based primarily on the claimant's self reports and during which the claimant demonstrated "questionable effort" (Exhibit 20F, 2), and "as per patient history", indicating that Dr. Vij relied almost entirely on the claimant's self-reports for his conclusions (Exhibit 21F). These limitations are in stark contrast to even the prior treating source statement alleging the ability to stand and walk for a total of 4 hours out of an 8-hour workday as discussed above (Exhibit 16F). However, the undersigned finds that these limitations are sufficiently reflected in the residual functional capacity finding that the claimant should have the ability to change positions from standing or

---

[108] *Id.*

[109] Tr. at 18.

walking to sitting at least at 30 minutes intervals. Further Dr. Vij's opinion that the claimant would require an additional 3-4 hours of additional breaks each work day lack credibility and are speculative at best, which again is in contrast to the prior treating source statement opining as to an extra ½ hour break (Exhibit 16F; 21F). Given the overly restrictive limitations that are inconsistent with the medical evidence, the treatment records, and the claimant's alleged activities, the undersigned gives this opinion partial weight (Id.). The possibility exists that a medical source may express an opinion in an effort to assist a patient with whom she sympathizes. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. However, the undersigned notes that the opined ability to lift and carry is consistent with and supports the residual functional capacity finding limiting the claimant to sedentary work (Exhibit 21F). In addition, Dr. Vij and the prior evaluation by Dr. Hashem opined as to rare limitations as to postural activities, which the undersigned finds overly restrictive given the basis for the opinions as discussed above and the over-reliance on the claimant's self-reports, and finds that the claimant's ability to perform postural activities is more accurately reflected in the residual functional capacity assessment that the claimant can push and pull as much as she can lift and carry; can never climb ramps, stairs, ladders, or scaffolds; and can occasionally balance, stoop, kneel, crouch and crawl. In addition, the undersigned further adopts the limitations that the claimant should never work at unprotected heights and never work around moving mechanical parts as consistent with the medical evidence (Exhibit 16F; 21F).[110]

Peoples contends as concerns Dr. Vij that ALJ failed to apply the proper standard for evaluating this opinion, failed to cite any contrary evidence and failed to address the fact that

---

[110] *Id.* at 19.

Peoples was referred to Dr. Vij specifically for a functional assessment.[111] Thus, she argues, good reasons have not been provided for the weight assigned.[112]

The ALJ particularly highlighted the referral to Dr. Vij in the sentence before she summarized his opinion and set forth her analysis.[113]  Further, as is set forth above, that the ALJ provided numerous reasons, supported by citations to the record, for the weight decision as concerns Dr. Vij. Significant among them is the reason that Dr. Vij relied "almost entirely on the claimant's self-reports for his conclusions."[114]  To that point, the ALJ also pointed to contrary findings in the record as to Peoples's ability to stand and walk, and as to postural limitations. In both cases, the ALJ supports her conclusions with reference to the record.

In sum, I find no error in the ALJ's assessment of the opinion of Dr. Vij.

*c.*   *Therapist*

Peoples maintains that the ALJ failed to analyze the opinion of her therapist in light of SSR 06-03p, and further failed to give good reasons for assigning little weight, especially since the therapist's opinion relied on test results, not Peoples's self reporting as the ALJ stated.[115]

---

[111] ECF # 15 at 18.

[112] *Id.*

[113] Tr. at 19.

[114] *Id.*

[115] ECF # 15 at 19-21.

As the Commissioner notes, there is no requirement when considering the opinion of a non-acceptable source such as a therapist that the ALJ explicitly evaluate that opinion according to any standard beyond that which applies generally to all opinions.[116] Moreover, the ALJ explicitly acknowledged that SSR 06-03p permits the use of opinion evidence from other sources to show severity and to document ability to function.[117] This is not an instance of the ALJ being unaware of the proper standard or failing to employ it. Further, the ALJ stated that the therapist's opinion was "inconsistent with the claimant's allegations of activity elsewhere in the record," which activities were noted in the opinion and have been cited above. Finally, the ALJ found that "the therapist herself found that the claimant exhibited inconsistencies during the evaluation that called into question her effort."[118]

I find no error in the ALJ assessment of the opinion of Peoples's therapist, and find that the assessment is supported by good reasons which are stated on the face of the opinion and so are capable of meaningful judicial review.

*d.* *New evidence*

Peoples seeks a Sentence Six remand for the consideration of new evidence associated with diagnostic evidence from October 2014 showing the need for a right hip replacement, together with medical records from 2015 documenting that surgery and her discharge

---

[116] See, *Ealy v. Comm'r of Social Security*, 594 F.3d 504, 514 (6th Cir. 2010).

[117] Tr. at 18.

[118] *Id.* (citing record).

orders.[119] She contends that the evidence is "new" in that it concerns evidence produced shortly before and after the hearing in this matter, and is "material" in that if the Commissioner knew the full extent of her right hip impairment, and its effect on ambulation, it is probable that a more restrictive RFC would be imposed.[120] She also states that there is "good cause" for not submitting this information at the hearing, since it was not available at that time.[121]

The Commissioner responds that, as to some portions of the asserted new evidence, this material existed before the hearing and so is not new nor is there good cause for its consideration.[122] Further, the Commissioner argues that there is no reason to think that a different result will obtain. Specifically, the Commissioner asserts that any evidence concerning right hip osteoarthritis that began in 2015 is outside the scope of the current claim and is properly brought only as new claim for benefits arising on the date the right hip was discovered to be an impairment.[123]

The record shows that Peoples was aware at the time of the hearing that she also needed a right hip replacement and so informed the ALJ.[124] To this degree, the evidence

---

[119] ECF # 15 at 22.

[120] *Id.* at 22-23.

[121] *Id.* at 22.

[122] ECF # 20 at 20-21.

[123] *Id.* at 22-23.

[124] Tr. at 44.

attendant to the right hip replacement surgery itself may not be a newly arising claim, but new evidence related to the present claim. Still, if the new evidence does no more than further document a known and pre-existing condition, it is not material under the regulations.

Peoples does not argue with any specificity that the new evidence shows that the surgery was unsuccessful or resulted in creating a worse or different condition,[125] except to note that immediately after discharge she was directed to use a cane or walker. It is uncertain if this prescription was temporary to the immediate post-surgery period or reflects a long-term change in her conditions arising from the right hip surgery. But in the latter case, new evidence of a worse condition occasioned by the surgery would be, as the Commissioner notes, the foundation of a new claim with a new onset date of March 18, 2015 - the date of the surgery - and so beyond the scope of this claim.

Accordingly, I do not find that the requirements for a remand under Sentence Six of 42 U.S.C. § 405(g) have been satisfied here.

## Conclusion

For the reasons stated, I find that substantial evidence supports the decision of the Secretary to deny benefits to Teneshia Peoples, and so I hereby affirm that decision.

---

[125] Peoples argues that it is probable that the ALJ would have determined the question of ambulation differently but does not specify how the event of the surgery would probably produce that result. If anything, the supposition would be that the surgery improved her ambulation.

IT IS SO ORDERED.

Dated: September 22, 2017                    s/ William H. Baughman, Jr.
                                             United States Magistrate Judge